# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ernest Bock & Sons, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia | : | |
| | : | |
| v. | : | No. 349 C.D. 2018 |
| | : | |
| Liberty Mutual Insurance Company, | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| Appeal of: Ernest Bock & Sons, Inc., | : | |
| Liberty Mutual Insurance Company | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| | : | |
| | : | |
| Ernest Bock & Sons, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia | : | |
| | : | |
| v. | : | No. 350 C.D. 2018 |
| | : | Argued: June 9, 2020 |
| Liberty Mutual Insurance Company | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| Appeal of: City of Philadelphia | : | |

**BEFORE:   HONORABLE P. KEVIN BROBSON, Judge**
**HONORABLE PATRICIA A. McCULLOUGH, Judge**
**HONORABLE J. ANDREW CROMPTON, Judge**

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                    **FILED:  August 12, 2020**

In these consolidated cross-appeals, Appellants Ernest Bock & Sons, Inc. (EBS), Liberty Mutual Insurance Company (Liberty), and Fidelity and Deposit Company of Maryland (Fidelity) (Liberty and Fidelity, collectively, Sureties) and Appellee City of Philadelphia (City)[1] appeal from an order of the Court of Common Pleas of Philadelphia County (trial court), dated February 9, 2018. The trial court granted, in part, and denied, in part, the parties' motions for post-trial relief. For the reasons set forth herein, we affirm, in part, and reverse, in part, the trial court's order.

## I. BACKGROUND

The relevant facts, as found by the trial court and/or set forth in the testimony and documentation presented by the parties at trial, and which the parties do not appear to dispute,[2] are as follows. The City's construction and renovation project for Terminal D-E of the Philadelphia International Airport was broken down into 4 phases/packages: Package 1A (Foundations and Structural Frame), Package 1B (Building Fit-Out), Package 2 (Renovation and Expansion of Ticketing Buildings), and Package 3 (Extension of E Concourse "Hammerhead"). (R.R. at 1139a.) Package 1B, which was commonly referred to as the Terminal D-E Expansion & Modernization, included the construction or "build out" of the empty steel frame connector building (Connector Building) located between Terminal D

---

[1] This Court had previously designated EBS and the Sureties as appellants and the City as appellee pursuant to Pennsylvania Rule of Appellate Procedure 2136.

[2] The only factual finding that the parties appear to dispute is Finding of Fact No. 113, which was modified by the trial court's February 9, 2018 order, and now provides: "For at least a substantial portion of the parapet walls, EBS did not begin installing pressure treated plywood until after June 12, 2008." (Trial Ct.'s Order dated Feb. 9, 2018; Reproduced Record (R.R.) at 1157a.) EBS and the Sureties argue that "this finding is contrary to the evidence that as of June 12, 2008, EBS had been installing plywood for over two months." (EBS's and the Sureties' Br. at 39.) Whether this finding is supported by substantial evidence of record is irrelevant to our disposition of the issues presented in this appeal, and, therefore, we will not address the accuracy of this finding in any further detail.

and Terminal E (Project) that had been previously constructed under Package 1A. (*Id.*) Once completed, the Connector Building would contain 4 floors. (*Id.* at 1140a.)

On December 5, 2006, EBS submitted a bid proposal to the City to serve as the general contractor for the Project. (*Id.* at 1142a.) EBS, as the successful bidder, entered into a construction contract (Contract) with the City, which incorporated, *inter alia*, the Plans, Technical Specifications, and Standard Details and Specifications for the Project (collectively, Project Specifications) and the City's Standard Contract Requirements for Public Works Contracts (SCRs). (*Id.* at 1142a-43a, 1717a-1803a.) Generally speaking, the SCRs set forth the parties' rights, duties, and responsibilities under the Contract, including, but not limited to, what constitutes a violation of the Contract by EBS and what remedies are available to the City in the event of any such violation of the Contract by EBS. (*Id.* at 1717a-1803a.) Paragraph 33 of the SCRs, which is entitled "Default and Remedies," provides, in relevant part:

> (a) It shall be a violation of the Contract for [EBS] to abandon the work under the Contract; to fail or refuse to prosecute the work with promptness and diligence; to unreasonably delay the work so that it may not be completed within the contract time; to fail or refuse to proceed with work under a Disputed Change Order; to fail or refuse to furnish suitable materials in place of any which may be rejected by the Project Manager as unsuitable as not being in accordance with the Contract Documents, or to refuse or neglect to furnish and supply a sufficient number of properly skilled workers and necessary equipment or either of them; to execute any of the work improperly, carelessly, or in bad faith; to fail or refuse to remove any of the work which, in the opinion of the Project Manager, is defective and unsuitable and not in accordance with the Contract Documents, and to replace it with work that is in accordance with the Contract

3

Documents; to cause or to permit to occur an Event of Insolvency with respect to [EBS], or to otherwise violate any of the terms, conditions, and provisions of the Contract. In the event of a violation of the Contract, the [City] may notify [EBS] and [the Sureties] in writing to require that each remedy [EBS's] violation of the Contract and require [EBS] to comply with the terms, conditions, and provisions of the Contract which it has violated or is violating. The failure of the City to promptly notify [EBS] of a violation of [the] Contract shall not constitute an acceptance by the City of work which is performed or installed in violation of the Contract.

    (b) If [EBS] shall fail to cure or remedy, or diligently commence to cure or remedy, the violation of the Contract, as described in the notice specified above, . . . [the City] shall have the right to declare [EBS] in default of the Contract, and to notify [EBS] to discontinue the work or any part thereof under the Contract, and to call upon the [Sureties] to carry out [their] obligations under the performance bond posted for the Contract.

    . . . .

    (e) In case of such default by [EBS] the remedies herein provided shall be in addition to and not in substitution of the rights and remedies which would otherwise be vested in the City by statute, at law or in equity, all of which rights and remedies are specifically reserved to the City. . . . The failure of the City to exercise any of the remedies herein provided shall not preclude the resort by the City to any other remedy available to the City arising out of [EBS's] default.

(*Id.* at 1777a-78a.) Pursuant to Paragraph 61 of the SCRs, which is entitled "Contractor's Liability for Services and Materials," EBS continues to be responsible for its work on the Project regardless of the City's review, approval, or acceptance of or payment for EBS's work. (*Id.* at 1790a.) More specifically, Paragraph 61 of the SCRs provides, in relevant part:

    (a) Notwithstanding the acceptance and approval by the City of any work[, EBS] shall continue to be responsible for the professional quality, technical

4

accuracy and the coordination of all work under the Contract. [EBS] shall, without additional compensation, correct any defects, deficiencies or omissions in the work.

(b) The City's review, approval, or acceptance of, or payment for, any work performed under the [Contract] shall not constitute any representation, warranty or guaranty by the City as to the substance or quality of the work reviewed, approved, or accepted, and shall not be construed to operate as a waiver or estoppel of any of the City's rights or privileges under the Contract, nor or [sic] of any cause of action arising out of the performance of the Contract.

(*Id.*)

To guarantee its performance under the Contract, EBS obtained a Performance Bond from the Sureties.[3] (*Id.* at 1154a, 1721a-23a.) Pursuant to Paragraph 3 of the Performance Bond, the Sureties' obligations thereunder are triggered only "after the City has declared a Contractor Default as defined [therein], formally terminated the [Contract] or [EBS's] right to complete the [Contract], and notified the Suret[ies] of the City's claim under the Performance Bond." (*Id.* at 1721a.) Paragraph 14(c) of the Performance Bond defines a "Contractor Default" as "the failure or refusal of [EBS], after written notice from the City, to cure or remedy, or commence to cure or remedy, a [v]iolation of the [Contract]." (*Id.* at 1723a.) If and when the City satisfies all of the conditions set forth in Paragraph 3 of the Performance Bond, Paragraph 4 of the Performance Bond requires the Sureties to:

(a) Arrange for [EBS] to perform and complete the [Contract] . . . ; or

(b) Perform and complete the [Contract themselves] . . . ; or

---

[3] EBS also obtained a Payment Bond from the Sureties to guarantee the payment of EBS's subcontractors for their work on the Project. (R.R. at 1724a-25a.)

> (c)     Tender payment to the City in the amount of all losses incurred by the City as a result of the Contractor Default and as determined by the City for which the Suret[ies are] liable to the City, including all costs of completion of the [Contract] and all consequential losses, costs, and expenses incurred by the City as a result of the Contractor Default, and including all unpaid fees or payments owed to the City by [EBS] under the [Contract.]

(*Id.* at 1721a.)  Paragraph 5 of the Performance Bond requires the Sureties to act under Paragraph 4 "within [15] business days after notice from the City to the Suret[ies] of the Contractor Default, formal termination of the Contract[,] or [EBS's] right to complete the [Contract]." (*Id.*)  In the event that the Sureties do not proceed in accordance with Paragraphs 4 and 5 of the Performance Bond, Paragraph 6 of the Performance Bond provides that the Sureties will be in default of the Performance Bond and the City will be entitled "to enforce any legal or equitable remedy available to [it]." (*Id.*)  In addition, under Paragraph 7 of the Performance Bond:

> After the City has terminated the [Contract] or [EBS's] right to complete the [Contract], and if the Suret[ies are] proceeding under subparagraphs 4(a) or 4(b) above, then the responsibilities of the Suret[ies] to the City shall not be greater than those of [EBS] under the [Contract], and the responsibilities of the City to the Suret[ies] shall not be greater than those of the City under the [Contract].  The Suret[ies] shall be obligated to the limit of [the] Bond Amount set forth on the front page, subject, however, to a commitment by the City for payment to the Suret[ies] of the Balance of the Contract Price in mitigation of costs and damages on the [Contract].  The Suret[ies] shall be obligated, without duplication, for:
>
>        . . . .
>
> (b)     Additional legal, design professional, and delay costs incurred by the City as a result of the Contractor[] Default, and as a result of the Suret[ies'] actions or failures to act under Paragraph 4 above[.]

(*Id.* at 1722a.)

6

On July 2, 2007, the City provided EBS with notice to proceed with its construction on the Project. (*Id.* at 18a-19a, 1155a.) Based on the City's notice to proceed, EBS had until December 3, 2008—or 520 calendar days from July 2, 2007—to complete its work on the Project. (*Id.* at 1155a.) In order to ensure that it could complete the Project within the 520 days, EBS intended to work on all 4 floors of the Connector Building simultaneously. (*Id.* at 2657a.) Despite the City's issuance of its notice to proceed, however, EBS was not able to immediately commence full construction activity on the Project, because the contractor that was responsible for the foundation and structural frame of the Connector Building under Package 1A had not yet completed its work, and EBS did not have access to all of the floors of the Connector Building until approximately November 2007. (*Id.* at 2572a, 2657a-58a.) By letter to the City dated August 30, 2007, EBS reserved the right to seek a time extension under the Contract as a result of the City's delay in turning over the Project to EBS. (*Id.* at 2711a-12a.)

All construction on the Project was subject to the 2003 International Building Code (IBC). (*Id.* at 1140a.) Under the IBC, the Connector Building was classified as construction Type 1B, which required the Connector Building to be constructed with noncombustible materials and mostly 2-hour fire resistant assemblies.[4] (*Id.*) As a result, Section 06160 of the Project Specifications called for the utilization of "USG FIBEROCK Brand Sheathing, Aqua Tough" (Aqua Tough sheathing), a noncombustible material, in the construction of the exterior parapet walls of the Connector Building. (*Id.* at 1156a, 7873a-76a.) In fact, Paragraph 63 of the SCRs

---

[4] At some point after the Project was substantially complete, the City obtained permission to classify the Connector Building as Type 2A construction under the IBC; this change did not, however, alter the requirement that the Connector Building be constructed with noncombustible materials. (R.R. at 1140a.)

7

specifically required that "[t]he materials used in the work under the Contract . . . conform to the requirements of the [Project Specifications]." (*Id.* at 1790a.) In the event that EBS desired to change any of the Contract requirements, including the requirement for the utilization of Aqua Tough sheathing in the construction of the parapet walls, Paragraph 48(a) of the SCRs required EBS to obtain a "prior written order[] from the Project Manager authorizing the change and a [c]hange [o]rder fixing the additional compensation or deduction therefor." (*Id.* at 1783a.) Despite the Project Specifications' requirement for the utilization of Aqua Tough sheathing, EBS constructed the parapet walls of the Connector Building using pressure treated plywood, which is combustible and is not fire rated. (*Id.* at 1157a.) EBS then painted at least some of the plywood with intumescent paint, a paint that swells up when heated but that is not a substitute for fire-retardant wood. (*Id.* at 1158a.)

The City's Project Manager[5] was in charge of the work performed by EBS under the Contract. (*Id.* at 1765a, 7730a.) Gilbane McKissack (Gilbane), the entity retained by the City as the construction manager for the Project, represented the Project Manager "for on-site construction administration and construction management services" and served as the liaison between the City and EBS for all communications and approvals in connection with the work performed by EBS on the Project. (*Id.* at 1141a, 7730a, 7755a.) Daroff Designs, Inc. (Daroff) served as the architect for the Project. (*Id.* at 1141a.) Throughout the course of EBS's work on the Project, EBS had construction progress meetings with representatives from Gilbane and/or Daroff. (*Id.* at 1157a-58a, 7892a-7927a.) Minutes from the July 22, 2008 progress meeting noted that "[s]heathing for the roof was supposed to

---

[5] Tom Varughese served as the City's Project Manager from the commencement of the Project until September 2008, and Frederick Robinson served as the City's Project Manager from August 8, 2008, and thereafter. (R.R. at 1140a.)

8

be Aqua Tough, however, pressure treated plywood was installed. [EBS] is currently painting the wood with intumescent paint. [EBS] to provide supporting documentation from Siplast[, the manufacturer of the roofing materials,] for this action."[6] (*Id.* at 1157a-58a, 7892a.) During subsequent progress meetings on July 29, 2008, August 5, 2008, August 12, 2008, and August 19, 2008, EBS was advised that "a submittal [was] required for the current plywood." (*Id.* at 1158a, 7892a-94a.) Thereafter, on August 20, 2008, EBS provided Gilbane with a submittal, seeking approval of its construction of the parapet walls using pressure treated plywood painted with intumescent paint. (*Id.* at 1158a.) Gilbane notified EBS at the September 2, 2008 progress meeting that its submittal had been rejected. (*Id.* at 1158a, 7894a.) At subsequent progress meetings on September 9, 2008, September 16, 2008, September 23, 2008, and September 30, 2008, Gilbane advised EBS that the design team's "concerns [regarding the use of plywood in the construction of the parapet walls] must be addressed or the plywood will need [to be] replaced." (*Id.* at 1158a, 7894a-95a.) On October 6, 2008, EBS prepared a second submittal, again seeking approval of its construction of the parapet walls utilizing plywood rather than Aqua Tough sheathing. (*Id.* at 1158a-59a.) EBS's second submittal was also rejected. (*Id.* at 1159a.)

EBS did not substantially complete its work on the Project until December 28, 2008. (*Id.* at 1155a.) The City paid EBS $38,391,737.15 for its work on the Project and did not assess liquidated damages against EBS for its failure to substantially complete its work on the Project by December 3, 2008. (*Id.*) The City did, however, withhold retainage from EBS in the amount of $1,187,373.34 to cover

_____

[6] In a field activity report from March 5, 2008, a Siplast representative noted that, because the fourth floor level roof "is a vertical flashing area, the exterior sheathing must be exterior grade plywood." (*Id.* at 1948a-49a.)

9

its damages in connection with EBS's defective work on the Project. (*Id.* at 1185a.) In order to remediate EBS's defective work on the Project, including EBS's use of plywood in the construction of the parapet walls, the City retained the services of Mason Building Group, Inc. (Mason). (*Id.* at 1160a, 1166a.) The amount paid by the City to Mason for construction costs that is attributable to EBS's defective work on the Project was $3,357,282.21, which amount consists of $2,577,438.24 for the cost of Mason's base contract remedial work less a $26.50 clerical error, $130,970.47 for the cost of additional work, testing, and contingency, and $648,900 for the cost of mobilization/demobilization. (*Id.* at 1168a.) The City also incurred "soft costs" in connection with design and construction management services relative to Mason's remediation of EBS's defective work on the Project in the amount of $924,304.24. (*Id.*) In total, the City paid Mason $4,281,586.45 for remediation work attributable to EBS's defective work on the Project, $2,335,400.25 of which represented the cost to remove and replace the parapet walls.[7] (*Id.* at 1168a-69a, 6177a.)

On May 24, 2011, EBS filed a complaint against the City, alleging, *inter alia*, that the City breached the Contract by failing and refusing to pay EBS for certain amounts due and owing to EBS for work completed on the Project and for the premium time and acceleration costs that EBS incurred in connection with the City's delay of EBS's commencement of work on the Project. (*Id.* at 1a-78a.) Subsequent thereto, on July 13, 2011, the City filed an answer to EBS's complaint with new

---

[7] In their joint statement of errors complained of on appeal (Joint Statement), EBS and the Sureties asserted that only $2,335,400.25 of the $4,281,586.45 that the City paid to Mason in connection with EBS's defective work on the Project related to the cost of removing and replacing the parapet walls. (R.R. at 6177a.) The trial court had no reason to dispute EBS's assertion and accepted it for the purposes of its Pennsylvania Rule of Appellate Procedure (Rule) 1925(a) opinion. (Trial Ct. Op., May 8, 2018, at 15.)

10

matter and a counterclaim, alleging that EBS breached the Contract by failing to perform its work on the Project in accordance with the terms and conditions of the Contract. (*Id.* at 79a-148a.)

On November 9, 2011, during the pendency of this action before the trial court, the City served notice on the Sureties of its demand for performance under the Performance Bond. (*Id.* at 1155a, 2530a-31a.) The City's November 9, 2011 letter provided, in pertinent part:

> The City has performed its final inspection of the work[] and issued a final estimate pursuant to Paragraph 57 of [the SCRs]. The City has determined that [EBS] has failed, after reasonable notice and opportunity to cure, to complete the work of the Contract and to correct defective and unsuitable work. The City has determined that the total value of such incomplete and defective work is $2,345,106.62. Currently, the net amount due to the City is $1,157,733.28, which sum includes an offset for retainage.
>
> . . . .
>
> Pursuant to the terms of the [Performance] Bond, [P]aragraph 3, you are hereby notified that, at this time, the City has closed out the Contract, and [EBS] no longer has the right to complete the Contract. As required by the terms of the [Performance] Bond, [P]aragraph 5, please contact [the City] within [15] days to advise how the Suret[ies] wish[] to proceed.

(*Id.* at 2530a-31a.) By letter dated August 28, 2012, the Sureties denied the City's claim under the Performance Bond. (*Id.* at 1156a, 2534a-44a.) Thereafter, on September 28, 2012, the City sought leave from the trial court to join the Sureties to this action as additional defendants. The trial court granted the City's request, and, on November 20, 2012, the City filed a joinder complaint against the Sureties, alleging that the Sureties breached their obligations to the City under the terms and conditions of the Performance Bond. (*Id.* at 198a-245a.)

11

On September 25, 2017, following a lengthy non-jury trial that spanned several weeks over the course of several months and the parties' submission of proposed findings of fact and conclusions of law, the trial court issued extensive findings of fact and conclusions of law. (*Id.* at 1139a-1283a.) Concurrently therewith, the trial court issued a verdict in favor of the City and against EBS and the Sureties in the amount of $2,762,312.27—*i.e.*, the City's net damages of $3,601,535.74 less EBS's net damages of $839,223.47. (*Id.* at 1283a.) In reaching its verdict, the trial court concluded, in relevant part, that: (1) EBS violated the Contract by installing combustible pressure treated plywood on the parapet walls, by failing to provide the City with a submittal prior to installing pressure treated plywood on the parapet walls, and by failing and refusing to remove and replace the pressure treated plywood on the parapet walls despite a demand to do so; (2) the Sureties breached the Performance Bond by failing to tender payment to the City for the losses incurred by the City as a result of EBS's violation of the Contract; (3) as a direct and proximate result of EBS's violation of the Contract, the City was required to pay Mason to perform remedial work on the Project; (4) EBS was contractually barred from asserting a delay/acceleration claim against the City; and (5) the City was not entitled to an award of attorneys' fees under the Performance Bond. (*Id.* at 1155a, 1160a, 1169a, 1189a, 1282a-83a.)

EBS and the Sureties filed a motion for post-trial relief, as did the City. (*Id.* at 1286a-1370a, 1371a-84a.) Thereafter, on February 9, 2018, the trial court granted, in part, and denied, in part, EBS's and the Sureties' motion for post-trial relief and granted, in part, and denied, in part, the City's motion for post-trial relief. (*Id.* at 1664a-66a.) In so doing, the trial court, *inter alia*: (1) vacated its findings of fact and conclusions of law relative to its denial of EBS's delay and acceleration

claim and modified its decision to include an award of damages to EBS in the amount of $505,938 in connection with EBS's delay and acceleration claim; and (2) modified its decision to award the City post-judgment interest on its modified verdict of $2,194,960.27—*i.e.*, the amount of the original verdict reduced by, *inter alia*, the amount of EBS's damages in connection with its delay and acceleration claim. (*Id.* at 1665a-66a.)

The parties cross-appealed the trial court's order to this Court, and the trial court directed the parties to file statements of errors complained of on appeal pursuant to Rule 1925(b). In its Rule 1925(a) opinion, the trial court reasoned:

> EBS first complains "the [trial c]ourt erred in its valuation of damages for breach of contract regarding the parapets, entitling EBS to a new trial on the City's damages." For the reasons that follow, this [trial c]ourt does not agree.
>
> First, as a preliminary matter, EBS and the Sureties waived their issue regarding the measure of damages by asserting it for the first time in their post-trial motion. . . .
>
> . . . EBS and the Sureties never objected to the measure of damages presented by the City at trial. Therefore, EBS and the Sureties waived their claim that the cost of repair was "clearly disproportionate" and the burden was on "the City to introduce evidence as to diminution in value in order for the [trial c]ourt to make a determination as to the appropriate measure of damages."
>
> Second, even if EBS had not waived the issue, it has no merit. As the City has argued, "[c]ontract damages are intended to give the parties the benefit of the bargain.". . .
>
> EBS['] and the Sureties['] reliance on cases such as *Freeman v. Maple Point, Inc.*, 574 A.2d 684 ([Pa. Super.] 1990), is misplaced. "There, the Superior Court set aside an award based on the cost of correcting a water problem because such cost ($45,785.00) represented 48% of the cost of the house. It was because the award was grossly disproportionate on its face that the [Superior] Court required some evidence of the diminution

13

in value of the property as a result of the surface water problem."

The facts in the instant case are different than the facts in *Freeman*. An award of $2,335,400.25 to remove and replace the parapets was not patently disproportionate to the nearly $40 million the City paid EBS for its work on the [Project]. The City "did not receive a windfall by an award of the cost of repairing the defective [parapets]." "Therefore, it was not essential that the [City], in order to recover the costs of making repairs, prove by separate evidence that the repair costs were not grossly disproportionate to the diminution in value caused by the defective [parapets]." If EBS and the Sureties "deemed the cost of making repairs disproportionate to the diminution in the value of the [Connector Building], the burden was on them to introduce evidence establishing that fact[,] [which] they did not do."

Under such circumstances, EBS and the Sureties cannot now complain [that] "[t]he cost of removing and replacing the parapets was clearly disproportionate to the difference in the market value of the [Connector B]uilding with the installed parapets versus the market value of the [Connector B]uilding if the parapets were installed in accordance with the [C]ontract." As the City has argued, since there is no evidence of the value of the Connector Building:

> the relief sought by EBS under this issue, a new trial, would require, at a minimum, discovery being re-opened to permit the retention of . . . valuation experts, property investigations and evaluations[,] and gathering the requisite information for the preparation of an appraisal or other reports. In other words, a new trial would require this case to be re-litigated. The law simply will not allow EBS to do so after it failed to meet its own burden of rebuttal at trial.

EBS['s] and the Sureties['] next [2] complaints both relate to Paragraph 33 of the [SCRs]. In regard to Paragraph 33, these parties complain [that] the [trial c]ourt erred when it failed to consider the evidence that the City: (1) "waived its rights when it permitted plywood to be

14

installed in the parapets" and (2) "did not provide EBS with notice and an opportunity to cure the installation of the plywood in the parapets."

Specifically, in this regard, EBS and the Sureties argue there was waiver because "[t]he City, its [a]rchitect, and its [c]onstruction [m]anager were aware that EBS was installing plywood in the parapets, but failed to issue any notice to EBS in accordance with Paragraph 33 of the [SCRs] and stop the work and declare a default." EBS and the Sureties further argue that by not issuing notice, etc.[,] to EBS pursuant to Paragraph 33 of the SCRs, "the City failed to satisfy . . . contractual conditions precedent before demanding that EBS correct the parapet work under the [C]ontract and the [P]erformance [B]ond."

The Court did not fail to consider this argument/evidence—it just does not have any merit or dictate a different result. . . .

By its plain terms, Paragraph 33(a) [of the SCRs] states that "[i]n the event of a violation of Contract, the [City] may notify [EBS] and [the Sureties] in writing to require that each remedy [EBS's] violation of the Contract and require [EBS] to comply with the terms, conditions, and provisions of the Contract which it has violated or is violating." This "may" language is permissive, not mandatory. Accordingly, notice was not a condition precedent to the City's recovery and any failure to issue notice to EBS in accordance with Paragraph 33 of the [SCRs] did not result in a waiver of the City's right to have the parapets constructed pursuant to the terms of the Contract or [to] recover damages for EBS's failure to do so.

The City's complaints of error relate to: (a) denying the City's claim for attorneys' fees pursuant to the Performance Bond and (b) awarding EBS $505,938 for its delay and acceleration claim. Neither area of complaint has merit nor warrants relief.

. . . .

The City has argued that the Sureties are liable for all losses incurred by the City as a result of EBS's default, including attorneys' fees, because they did not exercise

15

their options under Paragraph 4 of the Performance Bond. Paragraph 7 of the Performance Bond states that when the Sureties have elected to complete performance of the Contract under Paragraph 4(a) or 4(b), the Sureties' obligations under the Performance Bond include "[a]dditional legal, design professional, and delay costs . . . ." Paragraph 6 of the Performance Bond, however, provides that when the Sureties have denied liability for a claim, the City is entitled to enforce any "legal or equitable remedies."

. . . .

Based upon the plain language of the Performance Bond, prepared by the City, Paragraph 7(b) only applies "if the Suret[ies are] proceeding under subparagraphs 4(a) or 4(b)." Here, however, the Sureties did not proceed under either subparagraph 4(a) or 4(b) of the Performance Bond; rather, the Sureties denied liability to the City. Therefore, it is clear the provisions set forth in Paragraph 7 of the Performance Bond are inapplicable, and the City is not entitled to attorneys' fees under the plain language of the Performance Bond. Moreover, even if there was ambiguity in this regard, which there is not, Pennsylvania law requires that the ambiguity be construed against the City as the drafter and, therefore, the American Rule holds true and the City cannot recover attorneys' fees from the Sureties in this case.

Regarding EBS's claim for delay and acceleration, the City primarily complains [that] "[t]he [trial c]ourt erred by reversing its initial findings in favor of the City and awarding [EBS] . . . $505,938 for its acceleration and delay claim . . . because its initial findings were factually and legally correct." However, for the reasons that follow, there was no error in this [trial c]ourt reversing its initial decision and awarding EBS $505,938 in delay/acceleration damages as the City suggests.

There is no dispute that EBS failed to formally "perform . . . contractual requirements . . . [for] sustain[ing] its delay/acceleration claim." The [trial c]ourt, however, accepted EBS's reliance on cases such as *James [Corporation] v. North Allegheny School District*[, 938 A.2d 474 (Pa. Cmwlth. 2007),] to support the

16

proposition that where the government clearly knew the operative facts giving rise to construction delays and the contractor's claim for acceleration of the work, the notice provisions of the contract can be satisfied informally. Therefore, upon further reflection, this [trial c]ourt reversed its initial determination and awarded EBS damages for delay/acceleration because: (1) there was an undisputed and significant delay in turning over the [Project]; (2) the completion date remained the same and extension requests were not granted when subsequent issues arose because the City had a predetermined date by which it needed the Connector Building [to be] finished; and (3) [Louis] Harris[, EBS's former vice president and project manager,] credibly testified on a number of points regarding this claim, including that the $505,938 was spent on additional supervisory personnel brought in to accelerate EBS's work.

In *James [Corporation]*, a contractor entered into a contract with a school district to renovate an elementary school building. The project incurred a number of delays attributable to the school district, but the school district did not grant any extensions of time. [*James Corporation*,] 938 A.2d at 480-81. In spite of those facts, the project was completed on time and the contractor subsequently brought suit against the school district, alleging . . . "[it] accelerated its work because [the] [s]chool [d]istrict refused to recognize the construction delays and adjust the [p]roject completion date accordingly." *Id.* at 481. The contractor further alleged that "[i]n order to meet the [p]roject deadline, . . . [it] accelerated its work and hired additional workers[,]" resulting in additional costs. *Id.*

The trial court awarded the contractor $215,000 in damages for acceleration/compression of the work. *Id.* at 482. On appeal, the Commonwealth Court affirmed in spite of arguments from the school district that the lower court erred in awarding such damages because there was a "no damages for delay" clause in the parties' contract and the "[c]ontractor failed to timely provide notice of its damages claim pursuant to the contract." *Id.* at 483-85.

As in *James [Corporation]*, the "no damages for delay" provision in this case was unenforceable. The City interfered with EBS's work by issuing the [n]otice to

17

[p]roceed for the [Project] even though the contractor for the earlier [Package] 1A phase of the construction and renovation had not completed its work[] and did not so fully until [90] days later. *James Corp.*, 938 A.2d at 484 (stating that "affirmative or positive interference sufficient to overcome [a] 'no damages for delay' clause may involve availability, access or design problems that pre-existed the bidding process and were known by the owner but not by the contractor[,]" and finding the school district interfered with contractor's work by issuing a notice to proceed without having obtained a requisite permit).

Moreover, as in *James [Corporation]*, the notice provisions in this case were satisfied, albeit informally. The City "clearly knew the operative facts giving rise to the construction delays and [EBS's] claims for accelerated work." *James Corp.*, 938 A.2d at 486 (finding the notice provision satisfied whether the school district was responsible for the delays due to its failure to obtain a requisite permit prior to issuing the notice to proceed, but refused to adjust the project completion date because of its overriding concern that not a single school day be missed).

Finally, regarding EBS's claim for delay and acceleration, the City complains "[t]he Court erred in sustaining EBS's objection to the City's introduction of City-38, EBS's Job Cost Summary, because City-38 proved that EBS did not incur excess costs to perform the work." According to the City, this exhibit shows "EBS spent approximately $8 million less than planned to perform the work . . . [and] the acceleration claim resulted in a windfall for EBS."

. . . .

The Contract in this case was a lump sum contract. Whether EBS spent approximately $8 million less than planned to perform the work, or earned a profit of at least $8 million, is irrelevant to EBS's delay/acceleration claim and the propriety of this Court awarding EBS $505,938 for additional supervisory costs. This is so because the additional cost for supervision was incurred as a result of the delay/acceleration attributable to the City and not contemplated in EBS's bid. What was relevant was the

18

credible testimony of Mr. Harris that [5] supervisors had to be brought in after the City caused delays and accelerated EBS's work.

City-38 was not a stand-alone document and by itself proved nothing. During the course of discussion regarding this document, it became clear the City wanted to use the exhibit to show EBS cut corners and saved money; therefore, the City owed EBS nothing for delay/acceleration [on] the Project in general. However, EBS['s] and the Sureties' counsel was correct when he stated: "This project is not a cost-plus project; it's a lump sum project. Whether [EBS] had a million dollars in costs or a dollar in costs is really irrelevant."

As a lump sum project, what was relevant was that the cost of additional supervision was not knowable at the time of the bid or figured into the bid. What was also relevant was that, per the credible testimony of Mr. Harris[,] the cost of additional supervision was incurred as a result of the delay in turning over the [Project] and the failure to grant extension requests when subsequent issues arose because of the pressure the City was under to complete the [Project] on time.

The City knew, or should have known, [of] EBS's complaints regarding the late start of the [Project], etc.[,] and refusal to grant any time extensions triggered the City's responsibility to remedy the situation. EBS was entitled to be awarded the cost for additional supervision and there was no error in doing so as the City suggests.

(Trial Ct. Op., May 8, 2018, at 15-26 (citations omitted) (heading omitted).)

Before we could review the trial court's decision and order on appeal, we required further clarification regarding an issue raised by EBS and the Sureties in their Joint Statement and brief to this Court. As a result, by memorandum and order dated March 22, 2019, this Court remitted the record to the trial court with instructions to file a supplemental Rule 1925(a) opinion, specifically addressing the issue raised by EBS and the Sureties in Paragraph 10 of their Joint Statement—*i.e.*, whether the City complied with the terms and conditions of

19

Paragraphs 3 through 5 of the Performance Bond—such that the trial court's judgment in favor of the City and against the Sureties should be affirmed. On September 24, 2019, the trial court[8] issued a supplemental Rule 1925(a) opinion, concluding that the City complied with the terms and conditions of the Performance Bond, because, "by letter dated November 9, 2011, . . . [the City] 1) declared EBS in default due, *inter alia*, to its installation of the plywood instead of Aqua Tough [sheathing], 2) formally terminated EBS'[s] right to complete the Contract, and 3) notified the Sureties of the City's claim under the [Performance] Bond." (Trial Ct. Suppl. Op., Sept. 24, 2019, at 4.)

## II. ARGUMENTS ON APPEAL

On appeal,[9] EBS and the Sureties argue that the trial court committed an error of law by: (1) failing to conclude that the City waived its right to object to EBS's construction of the parapet walls using plywood rather than Aqua Tough sheathing; (2) failing to conclude that the City neglected to satisfy the provisions of the Contract and/or the Performance Bond requiring the City to provide EBS with notice and an opportunity to cure before the City could demand that EBS correct the defects in the construction of the parapet walls or assert a claim under the Performance Bond; and (3) awarding the City damages for the cost to remove and

---

[8] The Honorable Patricia A. McInerney (Judge McInerney) presided over the lengthy bench trial, issued detailed findings of fact and conclusions of law, and issued the trial court's 1925(a) opinion in this matter. At some point between her issuance of the trial court's 1925(a) opinion and this Court's March 22, 2019 memorandum and order, Judge McInerney retired. Due to Judge McInerney's retirement, the trial court's supplemental 1925(a) opinion was issued by the Honorable Nina Wright Padilla.

[9] This Court's standard of review with regard to a trial court's grant or denial of a motion for post-trial relief is limited to determining whether the trial court abused its discretion or committed an error of law. *City of Phila. v. Benedetto*, 801 A.2d 1276, 1278 n.5 (Pa. Cmwlth. 2002).

20

replace the parapet walls in connection with EBS's breach of the Contract. In its cross-appeal, the City argues that the trial court committed an error of law by: (1) reversing its initial findings in favor of the City and awarding EBS damages for its delay and acceleration claim; and (2) concluding that the City was not entitled to an award of attorneys' fees under the Performance Bond.

## III. DISCUSSION

### A. Waiver by the City

EBS and the Sureties argue that the trial court committed an error of law by failing to conclude that the City waived its right to object to EBS's construction of the parapet walls using plywood rather than Aqua Tough sheathing, because the City observed the construction of the parapet walls for several months and never objected by issuing a notice to stop work or by declaring a default as required by the Contract. More specifically, EBS and the Sureties contend that: (1) Siplast directed EBS to construct the parapet walls using plywood instead of Aqua Tough sheathing, and EBS was obligated to follow Siplast's instructions; (2) the City, through Gilbane and Daroff, was aware of Siplast's instructions, observed EBS's construction of the parapet walls using plywood, and did nothing to stop EBS from constructing the parapet walls using plywood; (3) Daroff did not question EBS's use of plywood until the construction of the parapet walls had been ongoing for nearly 3 months and was nearly complete; and (4) the City paid EBS in full for the construction of the parapet walls. EBS and the Sureties further contend that the City's failure to object to EBS's use of plywood in the construction of the parapet walls "led EBS to believe that the City consented to EBS'[s] use of plywood." (EBS's and the Sureties' Br. at 38.)

In response, the City argues that the trial court properly concluded that the City did not waive its right to recover damages in connection with EBS's construction of the parapet walls using plywood rather than Aqua Tough sheathing.

More specifically, the City contends that the Contract clearly provided that the City was under no obligation to object to EBS's use of plywood in the construction of the parapet walls. The City further contends that, even if it was under an obligation to object, it "repeatedly told EBS that the installation of plywood was not allowed and would have to be replaced if no permission to substitute was obtained," and, while EBS requested permission to substitute, the City rejected EBS's requests. (City's Br. at 32.)

Parties to a contract can expressly or impliedly waive its provisions. *Black Top Paving Co., Inc. v. Dep't of Transp.*, 466 A.2d 774, 776 (Pa. Cmwlth. 1983). "Waiver is a voluntary and intentional abandonment or relinquishment of a known right." *Samuel J. Marranca Gen. Contracting Co., Inc. v. Amerimar Cherry Hill Assocs. Ltd. P'ship*, 610 A.2d 499, 501 (Pa. Super. 1992).[10] "Waiver may be established by a party's express declaration[—*i.e.*, an express waiver—]or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary"—*i.e.*, an implied waiver. *Id.* "An implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived." *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1223 (Pa. Super. 1989).

Here, EBS and the Sureties appear to contend that the City impliedly waived its right to object to EBS's failure to use Aqua Tough sheathing in the construction

---

[10] While we recognize that Pennsylvania Superior Court cases are not binding on this Court, such cases "offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Review*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

22

of the parapet walls, because the City observed and did not object to EBS's construction of the parapet walls using plywood. We disagree. The City's conduct was not inconsistent and did not suggest that the City would not require EBS to comply with the Contract's requirement to use Aqua Tough sheathing in the construction of the parapet walls. Quite to the contrary, representatives from Gilbane and/or Daroff, the City's construction manager and architect for the Project, informed EBS at numerous construction progress meetings that the Contract required EBS to construct the parapet walls using Aqua Tough sheathing and that EBS would need to replace the plywood if EBS did not obtain approval from the City to substitute the Aqua Tough sheathing with plywood. At some point after EBS had already constructed at least a portion of the parapet walls using plywood, EBS sought approval from the City to substitute the Aqua Tough sheathing with plywood, but the City denied EBS's requests. In other words, the City, consistent with the terms and conditions of the Contract requiring the use of Aqua Tough sheathing in the construction of the parapet walls, informed EBS that its use of plywood was not in accordance with the requirements of the Contract and would not be accepted by the City.

Additionally, the Contract specifically provides that the City's failure to object to EBS's construction of the parapet walls using plywood rather than Aqua Tough sheathing does not amount to a waiver of the City's ability to file an action against EBS for a violation of the Contract. Under Paragraph 33(a) of the SCRs, "[t]he [City's] failure . . . to promptly notify [EBS] of a violation of [the] Contract [does] not constitute an acceptance by the City of work which is performed or installed in violation of the Contract." (R.R. at 1777a.) Moreover, under Paragraph 61(a) of the SCRs, even if the City accepts and approves EBS's work on

23

the Project, EBS "continue[s] to be responsible for the professional quality, technical accuracy[,] and the coordination of all work under the Contract . . . [and] shall, without additional compensation, correct any defects, deficiencies or omissions in the work." (*Id.* at 1790a.) Similarly, under Paragraph 61(b) of the SCRs,

> [t]he City's review, approval, or acceptance of, or payment for, any work performed under the [Contract] shall not constitute any representation, warranty or guaranty by the City as to the substance or quality of the work reviewed, approved, or accepted, and shall not be construed to operate as a waiver or estoppel of any of the City's rights or privileges under the Contract, nor or [sic] of any cause of action arising out of the performance of the Contract.

(*Id.*)  Thus, even if, as EBS and the Sureties suggest, the City failed to object to EBS's use of plywood rather than Aqua Tough sheathing in the construction of the parapet walls, given the terms and conditions of the Contract, it was not reasonable for EBS to believe that the City had waived the Contract's requirement for the use of Aqua Tough sheathing in the construction of the parapet walls.  For all of these reasons, we cannot conclude that the trial court committed an error of law by failing to determine that the City waived its right to object to EBS's construction of the parapet walls using plywood rather than Aqua Tough sheathing.

### B.  Notice and an Opportunity to Cure

#### 1.  *Under the Contract*

EBS and the Sureties argue that the trial court committed an error of law by failing to conclude that the City neglected to satisfy the provisions of the Contract requiring the City to provide EBS with notice and an opportunity to cure before the City could demand that EBS correct the defects in the construction of the parapet walls.  EBS and the Sureties contend that, in doing so, the trial court failed to consider Paragraph 33(a)-(b) of the SCRs, which makes it mandatory that the City provide EBS with notice and an opportunity to cure before the City could declare a

24

default or a violation of the Contract. EBS and the Sureties further contend that the City did not present any evidence to establish that the City provided EBS with notice of a violation of the Contract or an opportunity to cure any such violation or that the City had declared EBS to be in default of the Contract and had notified EBS to discontinue its work on the Project; rather, "the City's witnesses admitted that no such procedure was followed." (EBS's and the Sureties' Br. at 41.)

In response, the City argues that the trial court properly rejected EBS's argument that the City failed to provide EBS with notice and an opportunity to cure the defective construction of the parapet walls. In that regard, the City contends that the notice provision set forth in Paragraph 33(a) of the SCRs—and the use of the word "may"—is permissive, not mandatory, and, therefore, the City was not required to provide EBS with notice and an opportunity to cure the defects in the construction of the parapet walls before the City could declare a default of the Contract. The City further contends that, even if it was required to provide EBS with notice and an opportunity to cure, it repeatedly notified EBS of the issue with using plywood in the construction of the parapet walls, and, "despite [its] warnings, EBS proceeded at its own risk and moved forward with the plywood installation without approval." (City's Br. at 34.) The City also contends that it is "completely disingenuous for EBS to now assert that it would have corrected the problems with the parapet walls had [EBS] only received notice of the defects, considering the fact that EBS has had literally years to correct these issues yet has failed to do so." (City's Br. at 34-35.)

In their reply brief, EBS and the Sureties argue that interpreting the use of the word "may" in Paragraph 33(a) of the SCRs as permissive "is contrary to the plain language of the [Contract] and is contrary to Pennsylvania law with respect to

25

contract interpretation, which requires that contracts be interpreted to give effect to all provisions." (EBS's and the Sureties' Reply Br. at 26.) EBS and the Sureties contend that, if notice under Paragraph 33(a) was optional, the mandatory language set forth in Paragraph 33(b)—*i.e.*, the use of the word "shall" in the context of the right to declare EBS in default—"would be wholly unnecessary [because] the City could declare a default and call upon the Sureties to complete the work on the Project absent a notice and [an] opportunity to cure." (EBS's and the Sureties' Reply Br. at 27.) EBS and the Sureties further contend:

> The more reasonable and logical interpretation of the word "may" in the context of Paragraph 33[(a)] is that the City has discretion in the event of a violation of the Contract whether or not to issue a notice of violation[, and i]f the City does not issue a notice of violation, then it is not permitted to declare [EBS] in default and call upon the [Sureties] to remedy the violation.

(EBS's and the Sureties' Reply Br. at 27-28.)

"Parties have the right to make their own contract, and it is not the function of [this] [C]ourt to rewrite [the contract] or [to] give it a construction in conflict with the plain meaning of the language used." *Dep't of Transp. v. Acchioni & Canuso, Inc.*, 324 A.2d 828, 830 (Pa. Cmwlth. 1974). Rather, this Court's "goal is to ascertain the intent of the parties and give it effect." *TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 260 (Pa. 2012). "When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *Id.* "[W]e must review and consider the entire instrument giving effect to all its provisions and construing it according to the plain meaning of its language." *Adams v. Pub. Util. Comm'n*, 819 A.2d 631, 634 n.7 (Pa. Cmwlth. 2003).

26

Here, Paragraph 33(a) of the SCRs clearly and unambiguously provides that the City "may" but is not required to provide EBS with notice and an opportunity to cure a violation of the Contract. Paragraph 33(a) provides, in relevant part:

> In the event of a violation of the Contract, the [City] *may* notify [EBS] and [the Sureties] in writing to require that each remedy [EBS's] violation of the Contract and require [EBS] to comply with the terms, conditions, and provisions of the Contract which it has violated or is violating.

(R.R. at 1777a (emphasis added).) The only reasonable and logical interpretation of the language of Paragraph 33(a) and the parties' use of the permissive word "may" is that the City was permitted but was not required to provide EBS with notice and an opportunity to cure before it could recover damages from EBS for a violation of the Contract. In addition, contrary to EBS's and the Sureties' contentions, Paragraph 33(b) is not useless if notice under Paragraph 33(a) is optional. Paragraph 33(b) provides, in relevant part:

> If [EBS] shall fail to cure or remedy, or diligently commence to cure or remedy, the violation of the Contract, as described in the notice specified above, . . . [the City] shall have the right to declare [EBS] in default of the Contract, and to notify [EBS] to discontinue the work or any part thereof under the Contract, and to call upon the [Sureties] to carry out [their] obligations under the performance bond posted for the Contract.

(*Id.* at 1777a-78a.) Construing this language in accordance with its plain meaning, as we are required to do, Paragraph 33(b) would apply in the event that the City provided EBS with notice and an opportunity to cure under Paragraph 33(a) and the City thereafter desired to declare a default or issue a stop work notice to EBS. In other words, Paragraph 33(a)-(b) requires the City to provide EBS with notice and an opportunity to cure only before it can declare EBS to be in default of the Contract and issue a notice to EBS to discontinue its work on the Project. Paragraph 33(a)-(b)

27

does not require the City to provide EBS with notice and an opportunity to cure if the City decides to have EBS complete its work on the Project and to thereafter file an action against EBS to recover damages in connection with EBS's violation of the Contract. This interpretation of Paragraph 33 is the only interpretation that gives effect to all of its provisions. For these reasons, we cannot conclude that the trial court committed an error of law by failing to conclude that the City neglected to satisfy the provisions of the Contract requiring the City to provide EBS with notice and an opportunity to cure before the City could demand that EBS correct the defects in the construction of the parapet walls.

## 2. Under the Performance Bond

EBS and the Sureties argue that the trial court committed an error of law by failing to conclude that the City neglected to satisfy the provisions of the Performance Bond requiring the City to provide EBS with notice and an opportunity to cure before the City could assert a claim under the Performance Bond. EBS and the Sureties contend that, in order to trigger the Sureties' obligations under the Performance Bond, the City was required to: (1) declare a Contractor Default under the Performance Bond; (2) terminate the Contract or EBS's right to complete the Contract; and (3) notify the Sureties of the City's claim under the Performance Bond. EBS and the Sureties contend further that the informal notice provided by the City at the weekly construction progress meetings regarding EBS's use of plywood rather than Aqua Tough sheathing in the construction of the parapet walls was insufficient to satisfy the City's obligation under the Performance Bond to provide EBS with written notice of a violation of the Contract and an opportunity to cure any such violation. EBS and the Sureties also contend that, given the City's failure to provide EBS with written notice of a violation of the Contract and an opportunity to cure any

28

such violation, the City was not entitled to declare a Contractor Default under the Performance Bond, and, therefore, the City's November 9, 2011 letter, which was sent almost 3 years after the City deemed the Project to be substantially complete, could not possibly serve as a declaration of a Contractor Default under the Performance Bond.

In response, the City argues that the trial court correctly concluded that the City properly invoked its rights under the Performance Bond because: (1) the City complied with Paragraph 33(a) of the SCRs by providing EBS with sufficient notice and an opportunity to cure its violation of the Contract—*i.e.*, its failure to utilize Aqua Tough sheathing in the construction of the parapet walls; and (2) the City's November 9, 2011 letter to the Sureties fulfilled the City's requirements under the Performance Bond—*i.e.*, it notified the Sureties of EBS's Contractor Default, it formally terminated EBS's right to complete the Contract, and it notified the Sureties of the City's claim under the Performance Bond.[11]

In their reply brief, EBS and the Sureties argue that, in order to declare a Contractor Default under the Performance Bond, Paragraph 33(a) of the SCRs

---

[11] The City also argues that EBS and the Sureties waived the issue of the City's compliance with the Performance Bond because they did not raise the issue prior to or during trial. We disagree. First, EBS and the Sureties were not required to establish that the City failed to comply with the terms and conditions of the Performance Bond at the time of trial. Rather, the City, as the party asserting a cause of action for breach of contract, was required to establish all of the elements necessary to prove that the Sureties breached the terms and conditions of the Performance Bond. *See In re Estate of Dixon*, 233 A.2d 242, 244 (Pa. 1967). Thus, any potential failure by EBS and the Sureties to point out that the City failed to meet its burden of proof at the time of trial does not result in a waiver of the issue for the purposes of this appeal. EBS and the Sureties raised the issue at the appropriate time—*i.e.*, after the trial court concluded that the City complied with the terms and conditions of the Performance Bond. Second, we have reviewed EBS's and the Sureties' joint motion for post-trial relief and Joint Statement and are satisfied that both documents sufficiently raise the issue of the City's compliance with the terms and conditions of the Performance Bond. (*See* R.R. at 1316a-17a, 6178a.)

29

required the City to provide both EBS and the Sureties with notice of a violation of the Contract. EBS and the Sureties contend further that the City failed to provide the Sureties with the notice required by Paragraph 33(a), and, therefore, the City deprived the Sureties of their own opportunity to cure EBS's alleged violation of the Contract.

Our analysis of the language of the Performance Bond produces a markedly different result than our analysis of the language of the Contract. Unlike Paragraph 33(a) of the SCRs, which clearly and unambiguously provides that notice and an opportunity to cure is permissive, Paragraph 3 of the Performance Bond clearly and unambiguously provides that the City was required to provide EBS with written notice and an opportunity to cure its violation of the Contract before the City could call upon the Sureties to perform under the Performance Bond. Paragraph 3 of the Performance Bond provides, in relevant part, that the Sureties' obligations "shall arise after the City has declared a Contractor Default . . . , formally terminated the [Contract] or [EBS's] right to complete the [Contract], and notified the Suret[ies] of the City's claim under [the] Performance Bond." (R.R. at 1721a.) The City alleges that its November 9, 2011 letter to the Sureties fulfilled its requirements under Paragraph 3 of the Performance Bond, because it notified the Sureties of EBS's Contractor Default, it formally terminated EBS's right to complete the Contract, and it notified the Sureties of the City's claim under the Performance Bond. The City ignores, however, that its November 9, 2011 letter cannot serve as notice of a Contractor Default because the City was not entitled to declare a Contractor Default. A Contractor Default is defined under Paragraph 14(c) of the Performance Bond as "the failure or refusal of [EBS], *after written notice from the City*, to cure or remedy, or commence to cure or remedy, a [v]iolation of the [Contract]." (*Id.* at 1723a

30

(emphasis added).) Thus, without written notice and an opportunity to cure, there cannot be a Contractor Default, and, without a Contractor Default, the City cannot invoke its rights under the Performance Bond. Contrary to the City's assertions, the informal notices/warnings that Gilbane and/or Daroff gave to EBS during the various construction progress meetings regarding EBS's use of plywood rather than Aqua Tough sheathing in the construction of the parapet walls are insufficient to satisfy the written notice requirement set forth in the Performance Bond. In addition, the City has failed to direct our attention to, nor have we been able to locate, any document in the record that would satisfy the written notice requirement and entitle the City to declare a Contractor Default under the Performance Bond. For these reasons, we must conclude that the trial court committed an error of law by determining that the Sureties breached the Performance Bond, and we reverse the trial court's verdict in favor of the City and against the Sureties.

## C. Breach of Contract Damages

EBS and the Sureties argue that the trial court committed an error of law by awarding the City damages for the cost to remove and replace the parapet walls in connection with EBS's breach of the Contract. EBS and the Sureties contend that, even though the City premised its request for damages on an alleged violation of the Philadelphia Building Construction and Occupancy Code (Building Code), which EBS and the Sureties allege was the City's only basis for seeking damages to remove and replace the parapet walls, the City never established a violation of the Building Code, and the trial court awarded damages based on findings that EBS breached the Contract, not that the parapet walls as constructed violated the Building Code. EBS and the Sureties contend further that the proper measure of the City's damages for EBS's breach of the Contract is the diminution in the value of the Connector Building because the cost to remove and replace the defective parapet walls was

31

"clearly disproportionate" to the diminution in value caused by the construction of the parapet walls using plywood rather than Aqua Tough sheathing. EBS and the Sureties also contend that they did not waive their ability to challenge the City's measure of damages because: (1) it was not their burden to introduce evidence as to diminution in value; (2) they challenged the City's damages at trial; and (3) the trial court addressed the issue on the merits thereby eliminating any deemed waiver of the issue.

In response, the City argues that the trial court did not commit an error of law in its valuation of the City's damages for EBS's breach of the Contract with respect to the construction of the parapet walls. The City first contends that EBS waived its ability to challenge the City's measure of damages because EBS did not object to the reasonableness or appropriateness of the City's damages at the time of trial, and the trial court's decision to address the merits of EBS's argument regarding the appropriate measure of damages had no effect on EBS's waiver of the issue. The City further contends that there is no evidence of record to support EBS's "assertion that the cost to remediate the parapet walls was 'clearly disproportionate' to the probable loss to the City," and, therefore, EBS, not the City, was required to present evidence on the diminution in the value of the Connector Building, which EBS did not do. (City's Br. at 38.) The City also argues that, contrary to EBS's belief, its "damages were not solely premised upon the existence of an alleged violation of the [Building] Code" but also on "EBS'[s] countless breaches of the Contract." (City's Br. at 41.)

"In order to preserve an issue for appeal, a litigant must make a timely, specific objection at trial and must raise the issue [in its] post-trial motions." *Reilly v. Se. Pa. Transp. Auth.*, 489 A.2d 1291, 1296 (Pa. 1985). It is insufficient "to raise

32

grounds [for an objection] for the first time in [a] post-trial motion[].” *Lawrence G. Spielvogel, Inc. v. Twp. of Cheltenham*, 601 A.2d 1310, 1318 (Pa. Cmwlth. 1992); *see also* Pa. R.C.P. No. 227.1(b). In other words, “[a] party ‘may not, at the post-trial motion stage, raise a new theory which was not raised during trial.’” *E.S. Mgmt. v. Yingkai Gao*, 176 A.3d 859, 864 (Pa. Super. 2017) (quoting *Keffer v. Bob Nolan’s Auto Serv., Inc.*, 59 A.3d 621, 630 (Pa. Super. 2012), *appeal denied*, 69 A.3d 602 (Pa. 2013)). A party that asserts an objection for the first time in a post-trial motion—*i.e.*, does not make a timely objection at the time of trial—has waived the objection for purposes of appeal. *Id.* (noting that even if objection is raised in Rule 1925(b) statement, objection is still waived for purposes of appeal because issue not properly raised before trial court cannot be raised for first time on appeal).

Here, the trial court concluded that EBS and the Sureties waived their ability to challenge the City’s measure of damages because EBS and the Sureties did not object to the City’s measure of damages at the time of trial and raised the issue for the first time in their motion for post-trial relief. We agree. While EBS and the Sureties contend that the trial court’s conclusion on the issue of waiver is incorrect, EBS and the Sureties have not directed our attention to any place in the record where they objected to the City’s measure of damages and/or represented to the trial court that, in the absence of a Building Code violation, the proper measure of the City’s damages was the diminution in the value of the Connector Building, not the cost to remove and replace the parapet walls. Rather, EBS and the Sureties suggest that they were not obligated to challenge the City’s damages at the time of trial because it was the City’s burden, not theirs, to introduce evidence on the diminution in value of the Connector Building. Even assuming, *arguendo*, that the proper measure of the City’s damages was the diminution in the value of the Connector Building and

33

that it was the City's burden to present evidence thereon, the City's failure to present any such evidence did not relieve EBS and the Sureties of their obligation to timely object to the City's assertion of what EBS and the Sureties believed to be an improper measure of damages. In other words, this was not simply a matter of whether the City failed to meet its burden of proof, but rather, whether the basis upon which the City calculated its damages was appropriate. Under these circumstances, EBS and the Sureties could not sit idly by under the guise that the City did not meet its burden of proof and were required to object to the City's measure of damages.

Alternatively, EBS and the Sureties contend that, even if they were required to challenge the City's damages at the time of trial, they sufficiently did so because: (1) they "addressed the costs that Mason incurred . . . in connection with the remediation work during the cross-examination of Mason's witness"; and (2) "the cumulative evidence at trial made clear that the remediation work with respect to the parapet walls was entirely unnecessary." (EBS's and the Sureties' Br. at 57-58.) EBS and the Sureties fail to recognize, however, that, in order to preserve their challenge to the City's measure of damages for the purposes of their post-trial motion and this appeal, they were required to do more than simply challenge the amount of the City's damages; rather, they were required to specifically object to the City's assertion of what it believed to be the appropriate measure of its damages. As stated above, EBS and the Sureties have not directed our attention to, nor have we been able to locate, any place in the record where EBS and the Sureties lodged such an objection. For these reasons, we must conclude that EBS and the Sureties waived their ability to challenge the City's measure of damages on appeal.

34

EBS and the Sureties further suggest that, even if they did waive their ability to challenge the City's measure of damages by failing to object at the time of trial, the trial court somehow removed their waiver by addressing the issue on the merits. In support of this argument, EBS and the Sureties cite *American Association of Meat Processors v. Casualty Reciprocal Exchange*, 588 A.2d 491 (Pa. 1991), and *Soderberg v. Weisel*, 687 A.2d 839 (Pa. Super. 1997), for the proposition that "where a party raises an issue for the first time in a post-trial motion and the trial court nevertheless addresses the issue on the merits, the issue will not be deemed waived." (EBS's and the Sureties' Br. at 58-59.) EBS and the Sureties fail to acknowledge, however, that at least *Soderberg* is factually distinguishable from this case.[12] In *Soderberg*, the Superior Court decided to address the issues raised by the appellants for the first time in their post-trial motion because the trial court "was given the opportunity to correct its errors" and specifically "determined that [the] issues were not waived." *Soderberg*, 687 A.2d at 845. Here, unlike in *Soderberg*, the trial court concluded that EBS and the Sureties waived their ability to challenge the City's measure of damages but then went on to consider the merits of EBS's and the Sureties' argument, arguably in the interests of judicial economy—*i.e.*, to eliminate the need for a remand if this Court disagreed with the trial court's ruling on waiver.

---

[12] In *American Association of Meat Processors*, the Supreme Court rejected an argument of waiver and considered an issue that the appellant had raised for the first time in its post-trial motion at least in part because both the trial court and the Superior Court had considered the issue on the merits. *Am. Ass'n of Meat Processors*, 588 A.2d at 495. In its decision, the Supreme Court did not set forth whether the trial court and/or the Superior Court, like the *Soderberg* court, had previously determined that the issue had not been waived. Although we cannot state for certain that *American Association of Meat Processors* is factually distinguishable from this case, we must believe that the Supreme Court did not intend for this Court to disregard a trial court's finding of waiver just because, in the interests of judicial economy, the trial court explained the rationale of its decision to avoid a potential remand.

35

In light of this distinguishing fact, we will not ignore the trial court's finding of waiver and deem the issue to not be waived simply because the trial court addressed the issue on the merits.[13]

### D. Damages for Delay and Acceleration Claim

The City argues that the trial court committed an error of law by reversing its initial findings in favor of the City and awarding EBS damages for its delay and acceleration claim. The City contends, rather, that the trial court's original conclusion that EBS failed to prove its delay and acceleration claim was well supported by the terms and conditions of the Contract, including the "no damages for delay" clause, certain facts admitted by EBS, and the applicable law governing delay and acceleration claims. The City further contends that there was no basis for the trial court to vacate its findings/conclusion that EBS failed to prove its delay and acceleration claim because the "[t]rial [c]ourt cited no evidence to establish any of the elements it had previously noted were lacking and necessary to support [EBS's] delay/acceleration claim"—*i.e.*, causation and damages—but rather, "focused solely on whether the City had notice of some kind of delay/acceleration claim." (City's

---

[13] Although we have disposed of EBS's and the Sureties' argument relative to the City's measure of damages on the basis of waiver, we note that we have no reason to disagree with the trial court's award of damages to the City for the cost to remove and replace the parapet walls. The trial court concluded that "[a]n award of $2,335,400.25 to remove and replace the parapets was not patently disproportionate to the nearly $40 million the City paid to EBS for its work on the [Project]." (Trial Ct. Op., May 8, 2018, at 17.) Thus, once the City presented evidence on the cost to repair and replace the parapet walls, the burden shifted to EBS and the Sureties to establish that the cost to repair and replace the parapet walls was disproportionate to the diminution in the value of the Connector Building, which they did not do. *See Gloviak v. Tucci Constr. Co., Inc.*, 608 A.2d 557 (Pa. Super. 1992) (holding that when costs to repair are not patently disproportionate to property's value, it was not essential for homeowners to prove that repair costs were not grossly disproportionate to diminution in value; rather, if contractor believed cost of making repairs was disproportionate to diminution in value, burden was on contractor to introduce evidence establishing that fact).

Br. at 47.)  The City also contends that the trial court's reliance on *James Corporation* is misplaced because EBS did not present any evidence to establish causation or damages in support of its delay and acceleration claim.  Lastly, the City contends that EBS's delay and acceleration claim is a total cost claim, which is the least accepted method for establishing delay damages and should only be used under extraordinary circumstances when there is no other alternative for computing delay damages.

In response, EBS and the Sureties argue that the trial court properly awarded EBS damages in connection with EBS's delay and acceleration claim because:  (1) EBS met the notice requirements set forth in Paragraph 26(e) of the SCRs by providing the City with written notices of delay that specifically referenced activities that were impacted by the delay—*i.e.*, provided a "critical path" schedule—and a verbal estimate of its acceleration costs; (2) "even if EBS did not strictly comply with the notice provisions [set forth in Paragraph 26(e) of the SCRs], the City clearly knew the operative facts giving rise to the construction delays and EBS'[s] claims for acceleration of the work"; and (3) the no damages for delay clause set forth in Paragraph 26(f) of the SCRs is unenforceable because the City actively interfered with EBS's work on the Project.  (EBS's and the Sureties' Reply Br. at 40.)  EBS and the Sureties contend further that the trial court properly applied this Court's reasoning in *James Corporation* to the facts of this case in awarding delay damages to EBS.  EBS and the Sureties also contend that EBS was not required to perform a critical path method analysis to prove causation in support of its delay and acceleration claim or to prove its damages with mathematical exactness.  Lastly, EBS and the Sureties contend that, contrary to the City's assertions, EBS did not

utilize a total cost method to prove its delay and acceleration damages, but did so through the detailed testimony of one of its witnesses.

In its reply brief, the City argues that EBS failed to meet its burden of proof on its delay and acceleration claim because, while the trial court may have found that the City knew of EBS's claim, EBS did not prove causation and damages. In other words, EBS did not explain how the delay impacted the critical path of the Project or prove the difference between its total estimate and the total cost that it actually incurred on the Project.

"Acceleration damages occur when a contractor speeds up its work at a pace faster than prescribed in the original contract." *James Corp.*, 938 A.2d at 483 n.8. "A contractor may recover for increased costs incurred as a result of accelerating its performance where '(1) its own delays in performance are excusable, (2) the contractor was ordered to accelerate, and (3) the contractor did so and sustained extra costs.'" *Id.* (quoting *Dep't of Transp. v. Anjo Constr. Co.*, 666 A.2d 753, 757 (Pa. Cmwlth. 1995)). "To establish delay damages, a contractor must establish the extent of the delay, responsibility for delay, and the damages related to the delay." *John Spearly Constr., Inc. v. Penns Valley Area Sch. Dist.*, 121 A.3d 593, 602 (Pa. Cmwlth. 2015). "Ordinarily, 'no damages for delay' clauses are enforceable." *James Corp.*, 938 A.2d at 484. "However, Pennsylvania law recognizes [that] exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act on some essential manner necessary to the prosecution of the work." *Id.*

It is undisputed that the Contract contains a "no damages for delay" clause. Paragraph 26(f) of the SCRs provides, in relevant part:

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, [EBS] AGREES AND ACKNOWLEDGES THAT THERE SHALL BE NO PAYMENT OR COMPENSATION OF ANY KIND TO [EBS] FOR DAMAGES OR COSTS ARISING FROM ANY DELAY OR INTERFERENCE WHETHER SUCH DELAY BE AVOIDABLE OR UNAVOIDABLE.

(R.R. at 1774a.) EBS was, however, entitled to a reasonable extension of time to complete its construction under the Contract in connection with unavoidable delays or interference in the completion of the Contract that were caused by the City. (*See* Paragraph 26(c), (f) of the SCRs, R.R. at 1773a-74a.) In order to obtain this reasonable extension, Paragraph 26(e) of the SCRs required EBS to: (1) notify the City in writing of the delay or interference, the cause(s) of the delay or interference, and EBS's intention to seek an extension of time, all within 5 days of the start of the delay or interference; (2) submit a written claim to the City for an extension of time within 10 days of the conclusion of the delay or interference; (3) "demonstrate in writing the effect of the delay or interference on [EBS's] construction schedule, including plotting such effect on [EBS's] critical path documents, showing graphically therein the effect on the Contract completion date"; and (4) provide the City with "an estimate of the costs incurred by [EBS] as a result of the delay or interference." (*Id.* at 1773a-74a.)

It is also undisputed that EBS failed to formally satisfy the notice provisions set forth in Paragraph 26(e) of the SCRs relative to EBS's request for a reasonable extension of time and its associated claim for delay/acceleration damages. Despite these undisputed facts—*i.e.*, the existence of the "no damages for delay" clause set forth in Paragraph 26(f) of the SCRs and EBS's failure to formally satisfy the notice provisions set forth in Paragraph 26(e) of the SCRs—the trial court awarded EBS $505,938 in delay/acceleration damages. In so doing, the trial court, relying on this

Court's prior decision in *James Corporation*, concluded that: (1) the Contract's "no damages for delay clause" was unenforceable because "[t]he City interfered with EBS's work by issuing the [n]otice to [p]roceed for the . . . Project even though the contractor for [Package 1A] had not completed its work[] and did not . . . fully [do so] until [90] days later"; and (2) EBS informally satisfied the notice provisions set forth in Paragraph 26(e) because there was an undisputed and significant delay in turning over the Project to EBS and the City did not grant EBS's request to extend its completion date for the Project. (Trial Ct. Op., May 8, 2018, at 23-24.) The trial court further concluded that Mr. Harris, EBS's former vice president and project manager, credibly testified that, as a result of the City's delay in turning over the Project to EBS, EBS spent $505,938 on additional supervisory personnel to accelerate its work on the Project and to ensure that it would timely complete its work on the Project. (*See* Trial Ct. Op., May 8, 2018, at 23, 25.) We can find no reason to disagree with the trial court's reasoning, analysis, or application of our prior decision in *James Corporation* to the facts of this case. Contrary to the City's contentions, the trial court addressed all of the elements necessary to support a delay/acceleration claim, including causation and damages. As a result, we cannot conclude that the trial court committed an error of law by reversing its initial findings in favor of the City and awarding EBS damages in connection with its delay and acceleration claim.

### E. Attorneys' Fees Under the Performance Bond

The City argues that the trial court committed an error of law by concluding that the City was not entitled to an award of attorneys' fees under the Performance Bond. The City contends that the trial court's interpretation of Paragraph 7 of the Performance Bond leads to an absurd result because "the Suret[ies] would only be liable for legal fees if the Suret[ies] stepped into the shoes of the contractor, in this

40

case EBS, and performed the work using EBS or a contractor approved by the City[; i]n other words, the Suret[ies] would be liable for legal fees if [they] performed but not liable if [they] failed to perform." (City's Br. at 58.) The City contends further that a more sensible reading of the Performance Bond "would be that the Sureties are responsible for legal fees if they do not perform as required under the [Performance] Bond." (City's Br. at 58-59.) The City also contends that the trial court improperly construed the language of Paragraph 7 of the Performance Bond against the City because there was no ambiguity in the language of the Performance Bond.

In response, EBS and the Sureties argue that the trial court properly concluded that the City was not entitled to recover attorneys' fees from the Sureties under the Performance Bond, because the City failed to terminate the Contract or EBS's right to complete the Contract or declare a Contractor Default under the Performance Bond. As a result, the Sureties were not obligated to perform under the Performance Bond and could not be held liable for any damages thereunder, including attorneys' fees. EBS and the Sureties further contend that the Sureties denied liability under the Performance Bond and did not proceed under Paragraph 4(a) or (b), and, as a result thereof, the City's remedy was limited to Paragraph 6 of the Performance Bond, which, unlike Paragraph 7, did not entitle the City to recover its attorneys' fees from the Sureties. EBS and the Sureties also contend that, to the extent that the Performance Bond was ambiguous on the issue of attorneys' fees, the trial court properly construed such ambiguity against the City, the drafter of the Performance Bond. Lastly, EBS and the Sureties argue that, even if the City would be entitled to "additional legal costs" under Paragraph 7 of the Performance Bond, courts have

41

interpreted the language "additional legal costs" to mean administrative legal costs, not legal costs incurred during litigation.

In its reply brief, the City argues that the Sureties' obligation to perform under the Performance Bond was in fact triggered because the City's November 9, 2011 claim letter to the Sureties specifically indicated that the City had closed out the Contract and that EBS no longer had the right to complete the Contract. The City also reiterates that the trial court's interpretation of Paragraph 7 of the Performance Bond leads to an absurd result because the Sureties will only be liable for attorneys' fees in the event they perform under the Performance Bond, not when they fail to perform.

As explained more fully above, the City could not assert a claim against the Sureties under the Performance Bond because the City was not entitled to declare a Contractor Default—*i.e.*, the City neglected to satisfy the provisions of the Performance Bond requiring the City to provide EBS with notice and an opportunity to cure. In other words, the Sureties were not obligated to perform under the Performance Bond and, therefore, cannot be held liable to the City for any damages thereunder, including attorneys' fees. As a result, we cannot conclude that the trial court committed an error of law by concluding that the City was not entitled to an award of attorneys' fees under the Performance Bond, and we affirm the trial court's decision on this issue on alternative grounds.

42

## IV.  CONCLUSION

For all of the above-stated reasons, we affirm, in part, and reverse, in part, the trial court's order.

_____
P. KEVIN BROBSON, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ernest Bock & Sons, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia | : | |
| | : | |
| v. | : | No. 349 C.D. 2018 |
| | : | |
| Liberty Mutual Insurance Company, | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| Appeal of: Ernest Bock & Sons, Inc., | : | |
| Liberty Mutual Insurance Company | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| | : | |
| Ernest Bock & Sons, Inc. | : | |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia | : | |
| | : | |
| v. | : | No. 350 C.D. 2018 |
| | : | |
| Liberty Mutual Insurance Company | : | |
| and Fidelity and Deposit Company | : | |
| of Maryland | : | |
| | : | |
| Appeal of: City of Philadelphia | : | |

# **O R D E R**

AND NOW, this 12th day of August, 2020, the order of the Court of Common Pleas of Philadelphia County is hereby AFFIRMED, in part, and REVERSED, in part.

P. KEVIN BROBSON, Judge